707 F.2d 1147
 1983-1 Trade Cases 65,366
 The BOARD OF REGENTS OF the UNIVERSITY OF OKLAHOMA, a public
body corporate, and the University of Georgia
Athletic Association, a non-profit
corporation, Plaintiffs-Appellees,
v.
NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, Defendant-Appellant.
 No. 82-2148.
 United States Court of Appeals,
Tenth Circuit.
 May 12, 1983.
Rehearing Denied June 23, 1983.
 
 Frank H. Easterbrook, Chicago, Ill. (Robert H. Harry of Davis, Graham & Stubbs, Denver, Colo., George H. Gangwere and Richard K. Andrews of Swanson, Midgley, Gangwere, Clarke & Kitchin, Kansas City, Mo., and James D. Fellers of Fellers, Snider, Blankenship, Bailey & Tippens, Oklahoma City, Okl., with him on the briefs), for defendant-appellant.
 Andrew Coats and Clyde A. Muchmore, Oklahoma City, Okl. (Harvey D. Ellis, Jr., of Crowe & Dunlevy, Oklahoma City, Okl., and Stanley M. Ward, Chief Legal Counsel, University of Oklahoma, Norman, Okl., with them on the brief), for plaintiffs-appellees.
 Abbott B. Lipsky, Jr., Acting Asst. Atty. Gen. and Barry Grossman and Neil R. Ellis, Attys., Dept. of Justice, Washington, D.C., filed a brief for the United States of America, as amicus curiae.
 Lionel Kestenbaum, Larry D. Sharp, and Gary J. Smith, of Bergson, Borkland, Margolis & Adler, Washington, D.C., filed a brief for ABC Sports, Inc., as amicus curiae.
 J. Laurent Scharff, Philip L. Verveer, Judith L. Harris, Jack N. Goodman, and John L. McGrew, of Pierson, Ball & Dowd, Washington, D.C., filed a brief for Ass'n of Independent Television Stations, Inc., as amicus curiae.
 Herbert O. Reid, Howard University School of Law, Washington, D.C., and Alvin O. Chambliss, Oxford, Miss., filed briefs for Nat. Ass'n for Equal Educ. Opportunity, Inc., Nat. Black Media Coalition, Inc., Nat. Conference of Black Lawyers, Viewers of the South, and Black Mississippians Council on Higher Educ., as amicus curiae.
 Gerald A. Caplan and Alexander Halpern of Caplan & Earnest, Boulder, Colo., filed a brief for the Nat. Federation of State High School Associations, as amicus curiae.
 Before BARRETT, LOGAN, and SEYMOUR, Circuit Judges.
 LOGAN, Circuit Judge.
 
 
 1
 This is an appeal from a district court judgment holding the football television regulations of the National Collegiate Athletic Association to be in violation of sections 1 and 2 of the Sherman Act and invalidating contracts entered into between the NCAA and ABC Sports, Inc., CBS Sports, Inc., and Turner Broadcasting System, Inc. The plaintiffs-appellees are The Board of Regents of the University of Oklahoma and The University of Georgia Athletic Association. They want to be free to contract for the sale of broadcast rights to the football games of their universities. After a nonjury trial, the district court held that under section 1 of the Sherman Act the NCAA's television plan and the contracts are invalid per se because they constitute price fixing and group boycotts, and are also unlawful under rule of reason analysis. The court held that the NCAA violated section 2 by monopolizing the intercollegiate football broadcasting market. 546 F.Supp. 1276 (W.D.Okl.1982).
 
 
 2
 To resolve this appeal we consider: (1) whether the plaintiffs suffer antitrust injury and have standing to sue; (2) whether the television plan and contracts constitute price fixing unlawful per se; (3) whether the television plan and contracts are unlawful under rule of reason analysis; (4) whether the plan and contracts constitute group boycotts illegal per se; and (5) whether the relief granted below is overly broad.
 
 
 3
 The challenged NCAA regulations are found in the "1982-1985 NCAA Football Television Plan." Under the network television contracts entered into pursuant to the plan, ABC and CBS share exclusive first rights to negotiate with NCAA member institutions regarding the live broadcast of football games. In return for these negotiation rights ABC and CBS each guarantees to pay a "minimum aggregate compensation" of $131,750,000 over the four year contract period.[1] The contracts essentially eliminate competition between ABC and CBS for broadcast rights to the same games. See 546 F.Supp. at 1292-93. Both ABC and CBS are to broadcast 14 "exposures" per season--seven or eight exposures are one- or two-game national or seminational telecasts and the rest are three- to six-game regional exposures. Within the 14 exposures at least 70 teams are to appear on each network. At least 82 different schools must be featured on each network over the course of two seasons; the goal is to feature 115 different teams between the two networks. Although the contracts contemplate that most telecasts will be of "major" university (Division I-A) games, they obligate the networks to telecast a few small-college games and Division I-AA, II, and III championship playoff games. The television plan limits schools to six appearances every two years, with a maximum of four appearances the first year and five the second. These appearances must be divided evenly between ABC and CBS. During 1982 and 1983 Turner Broadcasting System, Inc. is permitted to select and cablecast over its Atlanta station games not selected by ABC or CBS. For 19 games each season Turner pays a minimum aggregate compensation of $17,696,000 over the two year contract period. Schools may sell the broadcast rights to their games to ABC, CBS, and Turner only.[2]
 
 
 4
 * Relying on Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), the NCAA asserts that the plaintiffs lack standing to assert antitrust violations because they allege injuries that are not of the type the antitrust laws were designed to redress. The violation claimed by the plaintiffs is that the television plan constitutes a marketwide horizontal price fixing conspiracy. They allege that to facilitate the pricing arrangement individual schools are precluded from exercising independent judgment with regard to output and price. Furthermore, they allege that the NCAA will expel and boycott institutions that violate the television plan.[3]
 
 
 5
 In Brunswick, the Court stated:"[T]hey must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendant's acts unlawful."
 
 
 6
 Id. at 489, 97 S.Ct. at 697. The television plan at issue here restricts the plaintiffs' revenues, market share, and output; the plan "cripple[s] the freedom of traders and thereby restrain[s] their ability to sell in accordance with their own judgment." Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 213, 71 S.Ct. 259, 260, 95 L.Ed. 219 (1951). This effect is potentially inconsistent with the Sherman Act's mandate of free competition and is virtually identical to injuries redressable in the vertical restraint context. Furthermore, compliance with the television plan is coerced by the threat of expulsion and boycott, sanctions which clearly have anticompetitive potential.
 
 
 7
 Although many of the injuries alleged by the plaintiffs are in the nature of vertical restraint injuries rather than the allocative efficiency/deadweight loss classically attributed to cartelization, we think the plaintiffs have standing to challenge the plan as a horizontal pricing conspiracy. The standing limitation expressed by Brunswick does not apply with full rigor to the instant case. Brunswick was an action for treble damages; here the plaintiffs seek injunctive relief only.[4] Section 16 of the Clayton Act states that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. Sec. 26. The plaintiffs allege antitrust injury inextricably intertwined with a horizontal price fixing conspiracy. See Blue Shield of Virginia v. McCready, --- U.S. ----, ----, 102 S.Ct. 2540, 2548-52, 73 L.Ed.2d 149 (1982). Inasmuch as the plaintiffs may challenge the clauses of the television plan that injure the members of the conspiracy, no valid reason appears why they should be foreclosed from challenging clauses that injure the victims of the conspiracy. The statute evinces no such limitation, and we are not inclined to engraft one upon it. To do so would hinder the congressional policy of eliminating artificial restraints from the marketplace. See Jeffrey v. Southwestern Bell, 518 F.2d 1129, 1132 (5th Cir.1975); In re Multidistrict Vehicle Air Pollution Litigation, 481 F.2d 122, 130-31 (9th Cir.), cert. denied, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973); 2 P. Areeda & D. Turner, Antitrust Law Sec. 335e (1978). Cf. Hawaii v. Standard Oil Company of California, 405 U.S. 251, 260-61, 92 S.Ct. 885, 890-91, 31 L.Ed.2d 184 (1972) (State of Hawaii as parens patriae).
 
 
 8
 We are not persuaded by the NCAA's contention that the plaintiffs are merely seeking a "bigger slice of the [cartel] pie" or are seeking to "promote internal cartel management" by reforming the cartel "so that the cartel members may obtain their benefits while avoiding their burdens." See Appellant's Brief at 53. In Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), similar arguments were made and rejected. In that case, the plaintiffs were Midas franchisees who alleged that certain clauses in the franchise agreement were illegal. The Court stated:
 
 
 9
 "Although petitioners may be subject to some criticism for having taken any part in respondents' allegedly illegal scheme and for eagerly seeking more franchises and more profits, their participation was not voluntary in any meaningful sense. They sought the franchises enthusiastically but they did not actively seek each and every clause of the agreement. Rather, many of the clauses were quite clearly detrimental to their interests, and they alleged that they had continually objected to them. Petitioners apparently accepted many of these restraints solely because their acquiescence was necessary to obtain an otherwise attractive business opportunity. The argument that such conduct by petitioners defeats their right to sue is completely refuted by the following statement from Simpson [v. Union Oil Co., 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964) ]: 'The fact that a retailer can refuse to deal does not give the supplier immunity if the arrangement is one of those schemes condemned by the anti-trust laws.' "
 
 
 10
 Id. 392 U.S. at 139-40, 88 S.Ct. at 1985. That the plaintiffs recognize the need for and accept the NCAA's regulation of intercollegiate athletics does not preclude their suit to challenge the television plan as violating the antitrust laws. We think that the allegations of the plaintiffs reflect antitrust injury and confer standing to sue under 15 U.S.C. Sec. 26.
 
 II
 
 11
 At the outset we must determine whether the NCAA's television plan and the network contracts constitute price fixing illegal per se under section 1 or whether they should be scrutinized under the rule of reason. The district court found them illegal per se. 546 F.Supp. at 1311. The nearly 600 institutional members of the NCAA, which include all "major" football powers, have agreed to market all of their football games to be offered for television viewing exclusively through the NCAA. By this agreement the teams have restricted the number of games to be telecast per season. The NCAA has negotiated fixed minimum total prices for the packages, which apparently have also always been the maximum. Although in theory the networks can pay different prices for different games, in practice the compensation paid does not vary from game to game.[5]
 
 
 12
 To the extent that the provisions of the television plan are naked attempts to restrict output and manipulate price, they are illegal per se under Arizona v. Maricopa County Medical Society, --- U.S. ----, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). The NCAA argues, however, that the restraints are not naked but accompany an integration of functions, that the restraints should be scrutinized under Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979), and therefore that the restraints should be analyzed under the rule of reason. While the NCAA is correct in asserting that Broadcast Music applies to restraints accompanying integrations, it incorrectly argues that Broadcast Music necessarily precludes application of the per se rule. Rather, the inquiry under Broadcast Music is "whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output ... or instead one designed to 'increase economic efficiency and render markets more, rather than less, competitive.' " 441 U.S. at 19-20, 99 S.Ct. at 1562. "The scrutiny occasionally required must not merely subsume the burdensome analysis required under the rule of reason or else we should apply the rule of reason from the start." Id. at 19 n. 33, 99 S.Ct. at 1562 n. 33 (citation omitted).[6]
 
 
 13
 Under Broadcast Music, price restraints accompanying a partial integration escape per se invalidation only when the integration "render[s] markets more, rather than less, competitive" and when the restraints are properly ancillary to the integration. In other words, "[t]he parties must be cooperating in an economic activity other than the elimination of rivalry, and the agreement must be capable of increasing the effectiveness of that cooperation and no broader than necessary for that purpose." R. Bork, The Antitrust Paradox 279. See also United States v. Addyston Pipe & Steel Co., 85 F. 271, 282-83 (6th Cir.1898), aff'd as modified, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899); United States v. Columbia Pictures Corp., 189 F.Supp. 153, 185-92 (S.D.N.Y.1960); L. Sullivan, Handbook of the Law of Antitrust Sec. 131. Our analysis of the television plan and contracts, including a comparison of these agreements to the arrangements in Broadcast Music, leads us to affirm the district court's conclusion that the plan and contracts constitute per se illegal price fixing. The NCAA television arrangement is so fraught with anticompetitive potential that it "appears to be one that would always or almost always tend to restrict competition."
 
 
 14
 * The NCAA is essentially an integration of the rulemaking and rule-enforcing activities of its member institutions. It performs many functions for its members, many of them noncommercial. It is the guardian of amateurism in the athletic programs of its members in essentially all intercollegiate sports. The NCAA determines playing rules, sets eligibility requirements, regulates recruiting, and establishes the requirements for and the number of scholarships that may be offered. It establishes when the seasons may start and must end, determines the number of games that may be played, and fixes the number of coaches a team may have. One sanction often levied for violation of these rules is the restriction of television appearances. The NCAA argues that the television plan is ancillary to this cooperative activity because the restraints promote the effectiveness of the cooperation by protecting live attendance at games and by promoting competitive balance, thereby improving the excitement of and the interest in both televised and live games.
 
 
 15
 The first argument, that the restraints promote rather than restrict output by protecting live attendance, does not qualify the restraints as ancillary. The NCAA argues that in the process of "manufacturing" football, two products are produced that are marketed to different consumers: the right to attend a game, which is sold to spectators, and the right to televise a game, which is sold to broadcasters. The NCAA contends that by restricting the sale of broadcast rights, consumption by spectators is increased.[7] We doubt on its face the argument that the output may be properly characterized as viewership. Even if we assume that consumption or viewership may be considered to be output, we think that total viewership--both live and televised--must be considered. An argument that total viewership is enhanced by restricting the sale of broadcast rights is speculative. The record contains some evidence that supports the conclusion the plan enhances live viewership, but no evidence was adduced to permit the court to gauge total viewership.[8] Finally, even if the television plan has the effect of promoting spectator consumption, this effect is not unambiguously procompetitive. It is at best competitively neutral. The plan promotes live attendance by restricting the availability of other options. It potentially creates inefficiencies, such as the reduced output of desired products and the increased consumption of less desirable products. Therefore, the restraints do not increase the efficiencies of the integration.
 
 
 16
 The second argument, that the restraints promote athletically balanced competition, also fails to meet the ancillarity test. First, this appears on its face to be a noneconomic justification. Noneconomic considerations, however worthy, cannot be used to justify restraints that adversely affect competition. National Society of Professional Engineers v. United States, 435 U.S. 679, 687-96, 98 S.Ct. 1355, 1363-68, 55 L.Ed.2d 637 (1978). Furthermore, as the district court noted, the argument that the restraints are necessary to promote athletic balance shades into the argument that competition will destroy the market. See 546 F.Supp. at 1310. The Sherman Act will not countenance an argument that the nature of a product or an industry structure is such that something other than competition is desirable. National Society of Professional Engineers, 435 U.S. at 689, 696, 98 S.Ct. at 1364, 1367-68. And, even if we assume the justification to be legitimate, the district court found on adequate evidence that any contribution the plan made to athletic balance could be achieved by less restrictive means.
 
 
 17
 The restraints contained in the television plan do not increase the efficiency of the rulemaking integration and are broader than necessary to achieve asserted procompetitive goals. Therefore, they are not ancillary to the rulemaking integration and do not escape per se invalidation under Broadcast Music on the basis of that integration.[9]
 
 B
 
 18
 The NCAA also asserts that the television plan is ancillary to an integrated marketing arrangement. It argues that the restraints enable NCAA football to be marketed as a television series and improve its competitive position against other television programming. Essentially, the television plan contains two groups of restraints, those that create an exclusive franchise arrangement with the networks and those that distort the prices paid for the individual games.[10] Under the plan, ABC, CBS, and Turner share the exclusive right to broadcast NCAA football. The grant of exclusivity restricts the buyers to whom schools may sell and prevents other broadcasters from purchasing broadcast rights. In connection with the exclusive rights the NCAA established a price--the minimum aggregate compensation fee. Both the grant of exclusivity and the setting of the minimum aggregate compensation price appear anticompetitive: exclusivity creates the risk of foreclosure of competition and price setting implicates monopoly power.[11]
 
 
 19
 The NCAA attempted to prove that the exclusive franchise restraints were necessary to penetrate the network programming market.[12] The NCAA asserts that the restraints permit college football to be promoted as a series, like "Dallas" or "M*A*S*H," in competition with other television programming. In essence, the NCAA is arguing that the plan restrains intrabrand competition (competition among football games) in order to stimulate interbrand competition (competition between NCAA football and other entertainment programming).[13] Stimulating interbrand competition at the expense of intrabrand competition is potentially procompetitive. Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 51-57, 97 S.Ct. 2549, 2558-61, 53 L.Ed.2d 568 (1977). It can result in a more vigorous marketing of the product, facilitating market penetration and increasing market share. Because the marketing integration could increase interbrand competition, the NCAA argues that the integration and its accompanying restraints should be assessed under the rule of reason.
 
 
 20
 Whether stimulating interbrand competition by restraining intrabrand competition is procompetitive depends in part on the nature of the interbrand product market. Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. at 52 n. 19, 97 S.Ct. at 2558 n. 19; ABA Section of Antitrust Law, Vertical Restrictions Limiting Intrabrand Competition 60-71 (Monograph No. 2, 1977). Therefore, it is difficult to assess the validity of the NCAA's argument without getting into the "enormous complexities of market definition that the per se rule seeks to avoid." R. Bork, The Antitrust Paradox 269. Broadcast Music makes clear that in assessing the facial validity of an integration, courts are not to engage in rule of reason analysis. 441 U.S. at 19 n. 33, 99 S.Ct. at 1562 n. 33. Yet we need not fully explore the plan's effect on the interbrand market because we conclude that the marketing integration itself is so fraught with anticompetitive potential that it must be considered invalid per se.[14] A comparison of the integration in Broadcast Music with the integrated marketing scheme in the instant case highlights the anticompetitive risks that inhere in the television plan and network contracts.
 
 
 21
 As did the performing rights societies in Broadcast Music, the NCAA offers a product--exclusive broadcast rights to all NCAA games--that is different from that which the individual schools could offer. However, unlike the blanket license at issue in Broadcast Music, the new and different product in this case comes at the expense of the product that would otherwise be offered by the schools. In Broadcast Music, the copyright holders retained the right to negotiate individual contracts: they could sell outside the blanket licensing arrangement. Under the television plan at issue here schools are not permitted to sell outside the network contracts. Not only does this restraint inhibit the freedom of the individual schools, it also poses a greater risk of cartelization than was present in Broadcast Music. There, the right of the copyright holders to sell outside the blanket licensing arrangement ensured the presence of potential competition to inhibit the exercise of market power by the performing rights societies. Here, every producer of commercially salable intercollegiate football is bound to sell through the television plan only. There is no potential competition from producers of intercollegiate football. Furthermore, the contracts restrict the total number of games to be broadcast; the district court found that more games would be shown in the absence of the controls. The television plan also poses vertical anticompetitive risks that were not present in Broadcast Music. The rights to NCAA football are sold on an exclusive basis whereas an unlimited number of blanket licenses were offered for sale in Broadcast Music. Unless there exist readily available substitutes for NCAA football, then, the television plan creates substantial vertical foreclosure. Moreover, because the football rights are sold only as a package, those broadcasters that are unable to bid for the entire package are permanently foreclosed from the market. The television plan and network contracts pose substantially greater anticompetitive risks than were present in Broadcast Music.
 
 C
 
 22
 In summary, the plan on its face suppresses product diversity and restricts output. It poses substantially greater risks of cartelization and vertical foreclosure than were present in Broadcast Music. The price distorting restraints are broader than necessary to promote the efficiencies of the integration. And while the ancillarity of the exclusive franchise restraints cannot be fully assessed without a rule of reason inquiry, the plan contemplates an impermissible integration: a combination of virtually all the producers, actual or potential, of a differentiated product--commercially salable intercollegiate football. In these circumstances we conclude that the television plan is one "that would always or almost always tend to restrict competition and decrease output." 441 U.S. 19-20, 99 S.Ct. at 1562. We affirm the district court's ruling that the television plan constitutes per se illegal price fixing.[15]III
 
 
 23
 Although we have upheld the trial court's judgment that the NCAA's television plan and the network contracts are illegal per se, we consider them under rule of reason analysis. We do so because given the state of the record and the prospect of review by the Supreme Court, scrutinizing the plan and contracts under the rule of reason promotes litigation efficiency. The trial court held that the plan failed under rule of reason analysis, and we affirm that conclusion.
 
 
 24
 In assessing the television plan under the rule of reason, the district court applied the test formulated in Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), which prohibits contracts that are "unreasonably restrictive of competitive conditions." Id. at 58, 31 S.Ct. at 515. "Unreasonableness under [the Standard Oil ] test could be based either (1) on the nature or character of the contracts, or (2) on surrounding circumstances giving rise to the inference or presumption that they were intended to restrain trade and enhance prices." National Society of Professional Engineers v. United States, 435 U.S. 679, 690, 98 S.Ct. 1355, 1364, 55 L.Ed.2d 637 (1978) (footnote omitted). Determining whether arrangements are by their nature or character unreasonable requires assessment of the restraints in the context of the market in which they operate.
 
 
 25
 "[T]he court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint, and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts."
 
 
 26
 Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918).
 
 
 27
 The television plan has a substantial impact on the structural characteristics of competition for the sale and purchase of intercollegiate football television rights. First, NCAA members are permitted to sell the broadcast rights to their games in accordance with the television plan only. There is only one vendor of intercollegiate football broadcast rights in the market; therefore, there exists no price competition among the schools for the sale of broadcast rights. Second, the broadcast rights are sold to three buyers: ABC, CBS, and Turner share the rights to broadcast NCAA football games. The rules set out in article 10 of the television plan restrict price competition among these buyers with regard to the rights to individual games. The plan therefore increases concentration in the marketplace in which broadcast rights to intercollegiate football are bought and sold: the market is composed of one seller and three buyers. There is no price competition among schools or among the buyers once contracts have been awarded. Furthermore, because the broadcast rights are sold only as a package, if a broadcaster does not have the financial ability to bid for the entire package or does not want the entire package, it cannot purchase football rights except within the narrow constraints of the exception telecast. Therefore, the number of broadcasters that can seek to become buyers of NCAA football broadcast rights is limited. This creates a potential for vertical foreclosure because only certain broadcasters have the resources necessary to become buyers of NCAA football rights.
 
 
 28
 The television plan has broader market implications than merely limiting the number of buyers and sellers of televised NCAA football. The plan presents marketwide anticompetitive risks of both a horizontal and a vertical nature. The horizontal risk is cartelization, with its accompanying supracompetitive pricing. Because the injuries that inhere in cartelization are incurred only if the NCAA possesses market power, whereas the asserted marketing efficiencies of the television plan are achievable in the absence of such power, scrutiny of the cartelization risk requires assessment of market power. The vertical anticompetitive risk is that potential buyers are foreclosed from purchasing a product for which no satisfactory substitute exists. Assessing this risk requires an analysis of readily interchangeable substitutes, an inquiry subsumed by an analysis of market power. Therefore, gauging the television plan's net effect on competition requires an assessment of market power.
 
 
 29
 Market power is the power to control prices or exclude competition. United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). Whether market power exists or can be exercised in the relevant geographic market depends upon the existence of competing products to which a purchaser can turn when faced with relative price increases. Whether product competition exists is determined by two factors:
 
 
 30
 "(a) The reasonable interchangeability of use to which two or more products can be put. This factor, in turn, is satisfied when two or more products (i) have essentially similar physical characteristics, or (ii) can be put to use for the same purpose.
 
 
 31
 (b) The cross-elasticity of demand, i.e., the extent to which consumer preference shifts freely between two or more products."
 
 
 32
 2 J. Von Kalinowski, Antitrust Laws and Trade Regulation Sec. 6G.04 (1982) (emphasis omitted). The "market is composed of products that have reasonable interchangeability for the purposes for which they are produced--price, use and qualities considered." United States v. E.I. du Pont de Nemours & Co., 351 U.S. at 404, 76 S.Ct. at 1012. Accord United States v. Grinnell Corp., 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). We look, then, to the ready availability of substitutable products.
 
 
 33
 The district court concluded that NCAA football constitutes a unique type of Saturday afternoon programming. This conclusion has adequate evidentiary support in the record. In terms of audience share NCAA football dominates Saturday afternoon programming. Furthermore, the cost per viewer for advertising time during NCAA football telecasts is more than 2 1/2 times greater than the average per viewer cost for other programming. This presumably is caused by the unique demographic makeup of the viewers of NCAA football--persons in middle to upper income brackets and college graduates. The characteristics of the programming most often scheduled opposite NCAA football--comedies, cartoons, and old movies--support the inference that NCAA football is unique in its time slot. Testimony at trial indicated that such programming does not appeal to the same audience; it does not seem to be readily interchangeable for NCAA football. Even professional baseball, which is broadcast opposite NCAA football during September, apparently is not readily interchangeable. The evidence showed that the cost per 1000 households for baseball advertising was $3.04, compared with $5.35 for NCAA football. In 1980, a 30-second advertising spot on NCAA football cost $47,900, compared with $17,100 for baseball. The demographics also vary significantly: the NCAA's share of households having income greater than $15,000 was twice baseball's share of these households. Professional football, which is perhaps the most logical substitute for NCAA football, is effectively precluded by the terms of its limited antitrust exemption from being broadcast on Saturday afternoon during the NCAA football season. See 15 U.S.C. Secs. 1291, 1293, 1294. Another indication that NCAA football is a unique form of Saturday programming is that when ABC had the exclusive right to televise, CBS "went dark" rather than compete against NCAA football--CBS offered no network programming but instead left its affiliated stations to fend for themselves. The record supports the trial court's conclusion that, considering price, use, and quality, NCAA football is a product for which there are no readily available substitutes.
 
 
 34
 It is true, as the NCAA argues, that the networks' willingness to pay supracompetitive prices is limited by their ability to recover the payments from advertisers. This does not arrest the inference that the NCAA has market power, however. Even if advertisers are willing, in the face of relative price increases, to substitute across different days of the week or across different programming, the networks cannot freely do so; they need programming to offer on Saturday afternoon. Furthermore, even if at current price levels both the networks and the advertisers consider other programming to be readily substitutable for NCAA football, the conclusion that the NCAA has market power is not foreclosed. The NCAA may already be pricing at supracompetitive levels and extracting supracompetitive profits, thereby making otherwise nonsubstitutable products attractive because prices are artificially high. See L. Sullivan, Handbook of the Law of Antitrust Sec. 16, at 56-57.
 
 
 35
 To inquire into market power in rule of reason cases is not to invoke a section 2 monopolization inquiry. In monopolization cases the court searches for the degree of market power possessed by a firm with an extremely large market share. See 2 E. Kintner, Federal Antitrust Law Sec. 12.6, at 352, 356-57 (1980) (collecting cases and noting that market share must approach 80% of the relevant market). Under the rule of reason, a more modest degree of power is sufficient. Therefore, any concern that the market definition may overstate power may be assuaged by attributing less significance to the market share possessed. L. Sullivan, Handbook of the Law of Antitrust Sec. 17, at 61. The district court found that the NCAA controlled virtually 100% of the relevant market, televised college football. See 546 F.Supp. at 1319-23. Even assuming that the market definition is too narrow, the NCAA's total control over televised intercollegiate football, when combined with NCAA football's apparent uniqueness from the perspective of broadcasters, supports the inference that the NCAA possesses some degree of market power.[16] Because the NCAA possesses market power the risks of cartelization and price enhancement are imminent. Also, because there exist no readily available substitutes for NCAA football the television plan creates substantial vertical foreclosure. Both these results are anticompetitive.
 
 
 36
 The NCAA seeks to justify the restraints contained in the plan by asserting that they promote athletically balanced competition among the schools and that they are necessary to penetrate the network programming market. As noted above, these assertions do not overcome the anticompetitive effects of the restraints. The trial court found that the disparity in revenues between schools can be reduced by means that do not threaten to cartelize the market or to restrict the number of buyers and sellers of NCAA football. A properly drawn system of pass-over payments to ensure adequate athletic funding for schools that do not earn substantial television revenues is one possibility. See White Motor Co. v. United States, 372 U.S. 253, 270-71, 83 S.Ct. 696, 705-06, 9 L.Ed.2d 738 (1963) (Brennan, J., concurring); Ohio-Sealy Mattress Manufacturing Co. v. Sealy, Inc., 585 F.2d 821, 828-29 (7th Cir.1978), cert. denied, 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979); United States v. Topco Associates, Inc., 1973-1 Trade Cas. (CCH) p 74,391, modified, 1973-1 Trade Cas. (CCH) p 74,485 (N.D.Ill.), aff'd mem., 414 U.S. 801, 94 S.Ct. 116, 38 L.Ed.2d 39 (1973); ABA Section of Antitrust Law, Vertical Restrictions Limiting Intrabrand Competition 20-25 & n. 63 (Monograph No. 2, 1977). Furthermore, the district court found that without the restraints imposed by the television plan more games would be shown at the local level. 546 F.Supp. at 1307. This would have the effect of equalizing revenues. To whatever extent the television plan reduces the disparity of revenues devoted to football and other athletic programs, the same result can be accomplished by means that do not violate the antitrust laws.
 
 
 37
 The television plan's contribution to penetrating the network programming market does not save the plan under the rule of reason. The district court concluded that there exist no readily available substitutes for NCAA football. This being the case, there is no interbrand competition in the network programming market to prevent the NCAA from extracting supracompetitive prices. Consequently, the removal of intrabrand competition among the schools totally eliminates price competition from the market. Finally, we note that the plan's restrictions affect NCAA Division I-A universities almost exclusively since they are the ones whose games might be commercially salable. Fewer than 100 schools fall within Division I-A; of these, 61 are members of the College Football Association, which has strongly manifested its displeasure with the television plan. See 546 F.Supp. at 1324-25. The district court concluded on adequate evidence that the 61 schools' ultimate decision to submit to the restraints in the television plan was the product of fear of NCAA sanctions, in football and other sports. Id. It is apparent that the schools whose games are used to penetrate the network programming market are not pleased with the cost at which this penetration is achieved. Rather, the district court concluded that the NCAA used its dominance in the regulation of intercollegiate athletics to obtain control of broadcast rights to intercollegiate football. In these circumstances we are not particularly disposed to consider the plan's impact on competition within the larger network programming market to be redeemingly procompetitive.
 
 
 38
 We affirm the district court's conclusion that the television plan is unreasonably restrictive of competitive conditions and therefore unlawful. It increases concentration in the marketplace; it prevents producers from exercising independent pricing and output decisions; it precludes broadcasters from purchasing a product for which there are no readily available substitutes; it facilitates cartelization. Against this array of antitrust injuries the NCAA's justifications are insufficient.
 
 IV
 
 39
 We agree with the NCAA that the trial court erred in holding that the television plan and network contracts constitute a group boycott illegal per se under section 1 of the Sherman Act. The court reasoned:
 
 
 40
 "NCAA members have agreed not to sell their product--football games--to certain buyers. Every broadcast and cable network in the country, other than ABC, CBS and TBS, are being boycotted. Further, those local broadcasters which are not affiliated with ABC or CBS are allowed to buy football games only in very limited circumstances."
 
 
 41
 546 F.Supp. at 1312. However, the NCAA television plan and contracts lack a necessary predicate to the existence of an illegal boycott. "The crucial element is an effort [by one competitor] to exclude or cause disadvantage to one or more [of its] competitors by cutting them off from trade relationships which are necessary to any firm trying to compete." L. Sullivan, Handbook of the Law of Antitrust Sec. 91, at 260. See also id. Sec. 83. The television plan and contracts do not constitute an attempt by NCAA members to shield themselves from competition offered by broadcasters: broadcasters are not in competition with NCAA members. The market relationship between the NCAA and the television industry is vertical. There is no contention here that the successful broadcasters have conspired with the NCAA to seek the exclusive arrangements in order to freeze out their competitors. The exclusivity features were used by the NCAA to extract the highest possible prices from the networks. The opportunity to purchase the rights to the NCAA football package was offered to all broadcasters. That certain networks were unsuccessful bidders, or did not bid at all, does not turn the contracts into boycotts.[17] 7] Given the vertical market relationship between the NCAA and the broadcasters and the open opportunity to bid for the package, on its face the television plan does not constitute an attempt by competitors at one level to foreclose competition by traders at the same level.
 
 
 42
 The cases cited by the district court do not compel a different conclusion. In Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), a retailer induced wholesalers and manufacturers to refuse to supply its competitor. In Fashion Originators' Guild of America, Inc. v. Federal Trade Commission, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941), clothing manufacturers organized a boycott of retailers who dealt in the clothing of competing manufacturers. In Radiant Burners, Inc. v. Peoples Gas Light & Coke Co., 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961), manufacturers of gas heaters coerced an adverse "seal of approval" decision with regard to the product of a competitor. Each of these cases reflects conduct by one firm inducing concerted action to deprive competing firms of necessary trade relationships, a characteristic absent here. We conclude that the NCAA's practices do not constitute a boycott of the networks not awarded broadcast rights.
 
 
 43
 The district court also held that by threatening to sanction schools that violated the television plan, the NCAA threatened a per se illegal boycott of those schools. 546 F.Supp. at 1295. Again we disagree. In the context of associational activities, the existence of an expulsion sanction does not by itself constitute a boycott. Unless resort to the expulsion sanction constitutes a naked attempt to exclude competition, the antitrust implications of an expulsion sanction turn on the competitive reasonableness of the rule being enforced. 2 J. Von Kalinowski, Antitrust Laws and Trade Regulation Sec. 6I.02; L. Sullivan, Handbook of the Law of Antitrust Sec. 88, at 247-48. Cf. United States v. Realty Multi-List, Inc., 629 F.2d 1351, 1374-85 (5th Cir.1980) (multiple listing service membership rules assessed for competitive reasonableness even though the rules effectively excluded certain realtors from membership); Florists' Nationwide Telephone Delivery Network--America's Phone-Order Florists, Inc. v. Florist's Telegraph Delivery Association, 371 F.2d 263, 267-69 (7th Cir.1967) (membership rules that caused members of defendant association to cease dealing with plaintiff scrutinized for competitive reasonableness). An association's rule or practice can in certain circumstances be considered facially unreasonable, see Fashion Originators' Guild; Radiant Burners; Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945), and thus can be summarily invalidated as an illegal boycott. However, when, as here, the reasonableness of the practice cannot be assessed summarily, it is improper to affix the label "boycott" and end all inquiry unless the proffered rule-enforcement justification appears to be merely a sham for some anticompetitive purpose. See North American Soccer League v. National Football League, 670 F.2d 1249, 1258-59 (2d Cir.), cert. denied, --- U.S. ----, 103 S.Ct. 499, 74 L.Ed.2d 639 (1982); United States Trotting Association v. Chicago Downs Association, Inc., 665 F.2d 781, 787-90 (7th Cir.1981) (en banc); Smith v. Pro Football, Inc., 593 F.2d 1173, 1177-82 (D.C.Cir.1978); 2 J. Von Kalinowski, Antitrust Law and Trade Regulation Secs. 60.03(4), 61.02, 61.07. The NCAA's expulsion sanction appears to be an enforcement mechanism and not a sham for an anticompetitive purpose. We have affirmed the trial court's ruling that the NCAA's television plan is illegal; hence, we need not assess the competitive reasonableness of the expulsion sanction in the context of the plan.
 
 V
 
 44
 The NCAA contends that the injunction granted by the trial court should be modified because it is too vague and too broad. The plaintiffs agree that standing alone the injunction is lacking in specificity and is overly broad, but argue that read in light of the violations found by the district court the injunction is proper. The NCAA specifically challenges paragraphs one, three, and four:
 
 
 45
 "(1) The right to telecast college football games is the property of the institutions participating in the games, and that right may be sold or assigned by those institutions to any entity at their discretion;
 
 
 46
 ....
 
 
 47
 (3) National Collegiate Athletic Association, its officers, agents and employees, shall be and hereby are enjoined from enforcing or attempting to enforce the provisions of the contracts above described and from making any other contract of similar kind or nature in the future;
 
 
 48
 (4) National Collegiate Athletic Association, its officers, agents or employees, shall be and hereby are enjoined from prohibiting member institutions from selling or assigning their rights to telecast the college football games in which they participate, and from requiring as a condition of membership that those institutions grant to National Collegiate Athletic Association the power to control those institutions' rights to telecast college football games."
 
 
 49
 The NCAA argues that the phrase in paragraph three, "other contract of similar kind or nature in the future," is vague and could be read to prohibit the NCAA from arranging for the broadcast of championship tournaments in Divisions I-AA, II, and III. It also argues that paragraph three can be construed to bar arrangements that it contends are lawful, such as a membership-wide contract with opt-out and pass-over payment provisions, or blackout rules. Finally, the NCAA contends that paragraph four could be read to prevent the NCAA from imposing sanctions for violations of non-television regulations and to prevent it from reserving Friday night for high school football only.
 
 
 50
 We hold that the NCAA should present its concerns regarding these paragraphs to the district court. Nevertheless, we comment on some of the arguments as an aid to the district court on remand. Paragraph four might be construed to prevent the NCAA from imposing television sanctions on schools that violate regulations unrelated to the television plan.[18] Paragraph four might also be read to preclude the NCAA from prohibiting games on Friday night. Neither of these effects is warranted by the violations found. Furthermore, paragraphs one and four appear to vest exclusive control of television rights in the individual schools. While we hold that the NCAA cannot lawfully maintain exclusive control of the rights, how far such rights may be commonly regulated involves speculation that should not be made on the record of the instant case. The NCAA's arguments regarding the specificity and self-sufficiency of the injunction should also be addressed by the district court.
 
 
 51
 We REMAND to permit the district court to consider its injunction in light of the views expressed in this opinion. In all other respects consistent herewith the judgment of the district court is AFFIRMED.
 
 BARRETT, Circuit Judge, dissenting:
 
 52
 I would reverse the judgment of the district court, quash the injunction and hold that the NCAA television regulations and contracts are valid and lawful. It is my view that the district court's findings, affirmed by the majority opinion, that the NCAA television contracts, and its adjunct rules, constitute per se price fixing violations under 15 U.S.C. Sec. 1 (1976) and monopolization violations under 15 U.S.C. Sec. 2 (1976) are clearly erroneous. I am convinced that although there is evidence to support the trial court findings, my review of the entire evidence leads me to a firm conviction that a mistake has been committed. United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948).
 
 
 53
 In concluding that the NCAA television contracts constitute per se price fixing violations, the district court found, inter alia: (a) that although it is true that membership in the NCAA is voluntary in the sense that a member institution may withdraw from the NCAA at any time, still, as a practical matter, membership in the NCAA is a prerequisite for institutions wishing to sponsor a major, well-rounded athletic program; (b) NCAA membership is not voluntary for Oklahoma and Georgia, or for many other member institutions for which athletic excellence is an institutional priority; (c) college football is a business, operated by professionals and, like any business, the schools participate in intercollegiate football to maximize revenue and minimize expense "while at the same time maintaining the level of quality which makes their product attractive to the buying public"; and (d) even though Oklahoma and Georgia properly challenge the NCAA television contracts as violative of the antitrust laws causing them injury, still they "believe that NCAA has an important role in regulating such matters as the rules of play, standards of amateurism and academic eligibility."
 
 I.
 
 54
 In concluding that college football is a business operated by professionals to maximize revenue and minimize expense, the district court specifically found:
 
 
 55
 Oklahoma's intercollegiate football program has, over the years, produced many outstanding and highly-ranked teams. Oklahoma is capable of attracting large national television audiences for its televised games. Football is the only sport sponsored by Oklahoma which actually generates revenue beyond the costs of fielding a team. The profits generated by the football team support all of the other sixteen men's and women's sports in which Oklahoma participates. In recent years, these programs have become more and more expensive to maintain due to increasing costs and the expansion of athletic programs for women. As a result, Oklahoma seeks to maximize its revenues from football television. Like Oklahoma, Georgia has compiled a record of outstanding success with its intercollegiate football program, and football is the major revenue producing sport for Georgia. Budgetary pressures have forced cuts in Georgia's athletic program, including the elimination of its intercollegiate wrestling program. Georgia also seeks to maximize the revenues generated from the televising of its football games.
 
 
 56
 Board of Regents v. NCAA, 546 F.Supp. 1276, 1282 (W.D.Okl.1982).
 
 
 57
 These findings do not address the purposes and objectives of the NCAA, i.e., preserving a competitive balance in intercollegiate athletics, insuring the amateurism of college athletics and avoiding the aura of professional sports. It is my view, as set forth more fully hereinafter, that the NCAA television plan's primary purpose is not anti-competitive. Rather, it is designed to further the purposes and objectives of the NCAA, which are to maintain intercollegiate football as an amateur sport and an adjunct of the academic endeavors of the institutions. One of the key purposes is to insure that the student athlete is fully integrated into academic endeavors. These are the "redeeming virtues" which did not impress the trial court or the majority. They are so compelling, in my opinion, that under the "rule of reason" analysis the public interest and that of the parties is served by sustaining the restraint as reasonable.
 
 II.
 
 58
 The NCAA is an unincorporated, non-profit, educational association with some 883 active members, consisting of private and public colleges and universities in the United States. The NCAA was formed in 1906 to regulate and supervise college athletics throughout the United States, and is dedicated to preserving amateurism in athletic activities among its member institutions, with the goal of maintaining those activities on an ethical plane in keeping with the dignity and high purpose of education. Thus, its goals are an integral part of the academic scheme. Of the approximate 883 members, participation in intercollegiate athletics involves about 271 members in Division I, 188 members in Division II and 281 members in Division III. Approximately 143 member institutions do not engage in intercollegiate athletics.
 
 
 59
 All divisions are subject to NCAA rules governing academic standards in intercollegiate athletics in keeping with the fundamental policy of the NCAA to maintain intercollegiate athletics "as an integral part of the educational program and the athlete as an integral part of the student body." Student-athletes must meet various academic standards in order to become and remain eligible for participation in NCAA sanctioned athletic events. These requirements are designed to insure that those who engage in college athletics are genuine students. One of the recent bylaws requires proof that the student-athlete makes proper progress toward a degree within prescribed terms to remain eligible for competition. Obviously, the success of the NCAA goal is in large measure dependent upon the good-faith approach to compliance by the member institutions.
 
 
 60
 In addition to a variety of rules designed to insure adequate academic achievement by student athletes, the NCAA has complex and detailed rules and regulations dealing with recruiting, financial aid or benefits (intended to foster participation in intercollegiate sports by genuine amateurs in the sense that the student-athlete is primarily dedicated to academic goals), and limitations on the coaching staffs. These goals are in large measure accomplished by a strong, vigilant investigative arm of the NCAA dedicated to insuring that its member institutions abide the various rules, standards and bylaws designed to maintain the competitive amateur status of intercollegiate football within the academic framework. The complexity of the NCAA bylaws, rules and interpretations evidence the association's effort to maintain and protect academic standards applicable to amateur student athletes.
 
 
 61
 The NCAA's committee on infractions is responsible for enforcement of the NCAA program. It receives complaints, and in reliance on its investigative staff, determines facts and violations, and fixes penalties. Charles Alan Wright, Chairman of the Infractions Committee, testified that the work of this committee is dedicated to the NCAA policy of maintaining intercollegiate athletics as an integral part of the educational program, with the athlete an integral part of the student body, thus retaining a clear line of demarcation between college athletics and professional sports. The district court gave no credence or recognition to this testimony or similar testimony of other witnesses.
 
 III.
 
 62
 There are relatively few federal court decisions speaking to the issue of amateur athletics' inclusion under the federal antitrust laws. However, professional basketball, golf and hockey have been consistently held to be within the meaning of the Sherman Act. See Annot., 18 A.L.R.Fed. 489 (1974) (citing federal court decisions applying federal antitrust laws exclusively to the "business of professional sports.").
 
 
 63
 In Hennessey v. NCAA, 564 F.2d 1136 (5th Cir.1977), the court was presented with a challenge to the NCAA bylaws limiting the number of assistant football coaches that a member institution could employ. The contention was made that the court was without jurisdiction because there had not been demonstrated sufficient impact on interstate commerce by virtue of the rule to bring the case within Sec. 1 of the Sherman Act. The court held otherwise on this issue but upheld the NCAA bylaws there challenged and pertinently observed:
 
 
 64
 A goal of the NCAA, one which is endowed with certain benefits to society, is to "retain a clear line of demarcation between college athletics and professional sports." Colleges with more successful programs, both competitively and economically, were seen as taking advantage of their success by expanding their programs, to the ultimate detriment of the whole system of intercollegiate athletics. Financial pressures upon many members, not merely to "catch up", but to "keep up", were beginning to threaten both the competitive, and the amateur, nature of the programs, leading quite possibly to abandonment by many. "Minor" and "minority" sports were viewed as imperiled by concentration upon the "money makers", such as varsity football and basketball.
 
 
 65
 [The NCAA regulation in question] was, with other rules adopted at the same time, intended to be an "economy measure". In this sense it was both in design and effect one having commercial impact. But the fundamental objective in mind was to preserve and foster competition in intercollegiate athletics--by curtailing, as it were, potentially monopolistic practices by the more powerful--and to reorient the programs into their traditional role as amateur sports operating as part of the educational processes.
 
 
 66
 Id. at 1153.
 
 
 67
 I believe that the trial court disregarded the purposes and objectives of the NCAA set forth in Hennessey, supra. Instead of recognizing the NCAA goal of fostering balanced amateur competition among the respective division colleges and universities, the trial court viewed intercollegiate football competition not only as a business, but as a "pot of gold" business for those colleges and universities which have consistently recruited top athletes in keeping with their institutional priority of attaining athletic excellence. I believe that Oklahoma, Georgia and other college football powers which desire to be free from the provisions of the NCAA television rules and bylaws, and assert their "right" to contract independently for television dollars, in truth and effect insist on the best of two worlds. While solemnly proclaiming their allegiance to all other NCAA rules and regulations pertaining to intercollegiate football, they insist on invalidating the NCAA television contracts and the provisos relative to distribution of the receipts therefrom, based on the additional monetary rewards that their excellent football programs command in national television. I firmly believe that to the extent that the NCAA's television restraints upon Oklahoma and Georgia and other member institutions with excellent football programs are anticompetitive, these restraints are fully justified under the rule of reason in that they are necessary to maintain intercollegiate football as amateur competition.
 
 IV.
 
 68
 In Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918), the Supreme Court succinctly stated the rule of reason to be: "The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." It is my view that the district court failed to adequately focus on the procompetitive features of the NCAA television plan-contracts when considered in light of the entire NCAA design and purpose, the central objective of which is to maintain intercollegiate athletics on an amateur competitive basis.
 
 
 69
 In Broadcast Music, Inc. v. CBS, Inc., 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979), the basic question before the Court was whether the issuance of blanket licenses to copyrighted musical compositions at fees negotiated by American Society of Composers, Authors and Publishers (ASCAP) and Broadcast Music, Inc. (BMI) constituted a per se price fixing in violation of the antitrust laws. The district court dismissed the CBS complaint, concluding that the blanket license was not price fixing and a per se violation of the Sherman Act. The court of appeals reversed, holding that the blanket license issued to television networks was a form of price fixing illegal per se and also copyright misuse. The Supreme Court reversed the court of appeals and remanded for further proceedings under the "rule of reason". Mr. Justice White delivered the opinion for the Court. Mr. Justice Stevens was the sole dissenter. The majority pertinently observed:In construing and applying the Sherman Act's ban against contracts, conspiracies, and combinations in restraint of trade, the Court has held that certain agreements or practices are so "plainly anticompetitive", National Society of Professional Engineers v. United States, 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978); Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 50, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977), and so often "lack ... any redeeming virtue", Northern Pac. R. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958), that they are conclusively presumed illegal without further examination under the rule of reason generally applied in Sherman Act cases. This per se rule is a valid and useful tool of antitrust policy and enforcement. And agreements among competitors to fix prices on their individual goods or services are among those concerted activities that the Court has held to be within the per se category. But easy labels do not always supply ready answers.
 
 
 70
 To the Court of Appeals and CBS, the blanket license involves "price fixing" in the literal sense: the composers and publishing houses have joined together into an organization that sets its price for the blanket license it sells. But this is not a question simply of determining whether two or more potential competitors have literally "fixed" a "price".... The ... literal approach does not alone establish that this particular practice is one of those types or that it is "plainly anticompetitive" and very likely without "redeeming value"....
 
 
 71
 Consequently, as we recognized in United States v. Topco Associates, Inc., 405 U.S. 596, 607-608, 92 S.Ct. 1126, 1133-34, 31 L.Ed.2d 515 (1972), "[i]t is only after considerable experience with certain business relationships that courts classify them as per se violations...." See White Motor Co. v. United States, 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963). We have never examined a practice like this one before....
 
 
 72
 * * *
 
 
 73
 * * *
 
 
 74
 More generally, in characterizing this conduct under the per se rule, our inquiry must focus on whether the effect and, here because it tends to show effect, see United States v. United States Gypsum Co., 438 U.S. 422, 436 n. 13, 98 S.Ct. 2864, 2873 n. 13, 57 L.Ed.2d 854 (1978), the purpose of the practice are to threaten the proper operation of our predominantly free-market economy--that is, whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output and in what portion of the market, or instead one designed to "increase economic efficiency and render markets more, rather than less, competitive." Id., at 441 n. 16, 98 S.Ct. at 2875 n. 16, see National Society of Professional Engineers v. United States, 435 U.S., at 688, 98 S.Ct. at 1363; Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S., at 50 n. 16, 97 S.Ct. at 2557 n. 16; Northern Pac. R. Co. v. United States, 356 U.S., at 4, 78 S.Ct. at 517.
 
 
 75
 Broadcast Music, Inc., supra 441 U.S. at 7-10, 19-20, 99 S.Ct. at 1556-57, 1562-63. (Footnotes omitted, emphasis supplied).
 
 
 76
 I recognize that if the rule of reason does not apply to the instant case, the NCAA television contracts may, by virtue of Arizona v. Maricopa County Medical Society, --- U.S. ----, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982), constitute per se illegal price fixing. This would result because the "maximum" sum is "fixed" by virtue of the contracts which are binding on the NCAA member schools. Maricopa holds that the per se rule applies when there exists "a price restraint that tends to provide the same economic rewards to all practitioners [colleges] regardless of their skill, their experience, their training, or their willingness to employ innovative and difficult procedures in individual cases." Id. at 2475. Per se violations of Sec. 1 of the Sherman Act are agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal. White Motor Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963); Northern Pacific Railway Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).
 
 
 77
 My research indicates that all of the reported cases wherein the per se rule has been applied have involved true competitive business enterprises operating in the interstate market where the goal is exclusively that of seeking a profit from the product or service offered to the public. See Broadcast Music, Inc. v. CBS, Inc., 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979); National Society of Professional Engineers v. United States, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); United States v. Topco Associates, Inc., 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). Restraints on competition or on the course of trade in merchandising products moving in interstate commerce are not violative of the Sherman Act unless the restraint is shown to affect market prices or otherwise deprive purchasers and consumers of the advantages to which they are entitled from free competition in the market place. Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940).
 
 
 78
 Maricopa, supra, National Society of Professional Engineers, supra, and Goldfarb v. Virginia State Bar, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), involved prohibitive price restraints, even though those restraints were enmeshed with overall programs designed to accommodate needs of people who would benefit therefrom. At the core, however, was the fact that in each case the professionally skilled participants were seeking profits from their services. Thus, their activities constituted business enterprises in a pure competitive sense. I do not view the NCAA television contracts as falling in that category, because they are not designed to render the greatest profit for a business purpose.
 
 V.
 
 79
 If the narrow focus in this case be placed, as I believe the trial court placed it, on the competition for television proceeds from contracts that are exclusively entered into by the NCAA and binding on its member schools, and contracts which may be entered into individually by the established intercollegiate football powers, I have little doubt that the total monetary benefits derived by the football powers would far exceed those received by them via the NCAA contracts. On that measure, then, the NCAA television contracts do constitute an anticompetitive restraint when compared with the potential dollars which the major football powers may command in the so-called "open market".
 
 
 80
 Nevertheless, I conclude that the NCAA restraints are completely defensible under the rule of reason. The restraints upon Oklahoma and Georgia and other colleges and universities with excellent football programs insure that they confine those programs within the principles of amateurism so that intercollegiate athletics supplement, rather than inhibit, academic achievement. As thus measured, the restraint is not unreasonable in its effect on competition; its procompetitive effect clearly outweighs the anticompetitive effect. See Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Furthermore, there is no showing that the NCAA restraints laid upon Oklahoma and Georgia have injured the consumer public, i.e., those who view intercollegiate athletic events on television. Thus, the "fall back" position taken by the district court--that antitrust regulation applies when, as here, an association wields exclusive control over television contracts involving the conduct of intercollegiate football--must fail. The district court erroneously focused on the inhibition placed upon Oklahoma and Georgia and those NCAA member institutions similarly situated who likely could command far greater individual (institution-wise) monetary return for television rights to their football games if permitted to contract independent of the NCAA.
 
 
 81
 In addition to the amateurism goals promoted by the NCAA, the NCAA's television contract restraints do, on balance, promote competition and enhance viewership at intercollegiate football contests. The NCAA television plan and its television contracts enhance overall viewership when one considers "output"--as entertainment--in the sense urged by the NCAA: those who view the games in the stadiums and those who view the games on television. If viewers are the "consumers", as certainly they must be for antitrust purposes, overall viewership for all games between all participating NCAA members engaging in football, whether Division I, II or III, is increased, rather than reduced by virtue of the NCAA television plan. Critically, live viewership at games is protected by virtue of the plan.
 
 
 82
 I note that there is a sharp dispute whether NCAA sets or dictates the television "package" with the networks. In Maricopa, supra, the Supreme Court applied the per se rule to the medical society's practice of setting maximum prices doctor members could claim in full payment for health services provided to policyholders of specified insurance plans. There was no dispute in Maricopa that the maximum price restraint tends to provide the same economic rewards to all medical practitioners, regardless of their dedication, skill or experience. There is no basis for comparing the medical practitioners in Maricopa with the NCAA member institutions. It is significant that the Maricopa majority observed that the "rule of reason" exception set forth in Continental T.V., Inc., v. GTE Sylvania Inc., supra, is the preferred method of determining whether a particular practice is in violation of the antitrust laws.
 
 VI.
 
 83
 It is my conclusion that the rule of reason militates in favor of the NCAA. Its television contracts allow for near equal per-game payments to member universities. I agree with NCAA's contention that, in the context of the Association's goals and purposes, this is no more "price fixing" than that involved in a law partnership's division of profits. The NCAA provisions on the division of television proceeds simply allocate those revenues among member institutions. This distribution does not affect television output. It does, however, foster competition among its members in keeping with its goal to assure amateurism in intercollegiate athletics and to maintain the primary status of the athlete as a student.
 
 
 84
 The NCAA distribution is aimed to assure a minimum of competitive balance on the playing fields. The NCAA is, then, a form of joint venture, and its television plan and contracts are an integral, all-important aspect of its purposes and goals. As such, the television contracts do not have the "pernicious effect on competition and lack of any redeeming virtue" stated in Northern Pacific Railway Co. v. United States, supra 356 U.S. at 5, 78 S.Ct. at 518.
 
 
 85
 The "Fundamental Policy" stated in the NCAA constitution, i.e., that of maintaining intercollegiate athletics as an integral part of the educational program, cannot be considered a profit-oriented goal. I conclude that the district court erred by subjugating the NCAA's educational goals (and, incidentally, those which Oklahoma and Georgia insist must be maintained in any event) to the purely competitive commercialism of "every school for itself" approach to television contract bargaining. The statement of "Purposes" for NCAA television contracts for the years 1982-1985, in sum, reveals the district court's error in refusing to recognize that under the rule of reason, the NCAA television contracts under challenge do not violate the federal antitrust laws:
 
 
 86
 The purposes of this Plan shall be to reduce, insofar as possible, the adverse effects of live television ... upon football game attendance and, in turn, upon the athletic and related educational programs dependent upon the proceeds therefrom; to spread football television participation among as many colleges as practicable; to reflect properly the image of universities as educational institutions; to promote college football through the use of television, to advance the overall interests of intercollegiate athletics, and to provide college football television to the public to the extent compatible with these other objectives.
 
 
 87
 Plaintiff's Exhibit "LT".
 
 
 88
 I would reverse the judgment of the district court.
 
 
 
 [1]
 The "minimum aggregate compensation" fee sets forth the total amount the networks must pay to the individual schools for the rights to particular games. If at the end of the season the minimum has not been paid, the balance is paid to the NCAA
 
 
 [2]
 A minor deviation from this rule is the "exception telecast." Essentially, games that qualify as exception telecasts are those (1) that are sold out or are being played more than 400 miles from the area in which the game is to be telecast, and (2) that will not be telecast within a certain distance of other football games unless those games are sold out. These telecasts occur infrequently and do not affect our analysis of the television plan and network contracts
 
 
 [3]
 Although the boycott claim presents a double contingency--the plaintiffs must sell broadcast rights in violation of the television plan and the NCAA must boycott the plaintiffs--the claim is ripe. The plaintiffs have adequately evidenced their desire to be free of the restrictions; indeed, Oklahoma executed a contract for the broadcast of its games. Also, the NCAA has publicly threatened to sanction institutions that violate its television plan. See 546 F.Supp. at 1286, 1302
 
 
 [4]
 Brunswick does not mandate the result sought by the NCAA for another reason. In Brunswick a vertical merger prevented Pueblo Bowl-O-Mat, Inc. from reaping profits that would have accompanied an increase in market concentration. Pueblo sued for those profits, alleging that the merger was unlawful. The Court denied recovery, stating that the lost profits Pueblo would have derived from a decrease in competition were not injury of the type the antitrust laws were intended to prevent. 429 U.S. at 489, 97 S.Ct. at 697-98. Here, the plaintiffs seek the right to compete in a market free from artificial restrictions
 
 
 [5]
 Because the networks possess exclusive rights to negotiate with the schools, the establishment of the minimum fee ensures that the schools will receive a "reasonable" payment for the broadcast rights. However, the fee also eliminates any incentive on the part of the networks to reward games of greater merit with higher payments. This effect does not necessarily reflect anticompetitive price enhancement (price fixing/allocative inefficiency in the economic sense), but it does reflect a distortion of free market forces
 
 
 [6]
 The United States' amicus brief suggests that because the trial court scrutinized the procompetitive justifications proffered by the NCAA, it employed a form of rule of reason analysis. The brief argues that it is improper to characterize a case as "per se" after assessing and rejecting proffered justifications. Broadcast Music holds otherwise. Permitting facial consideration of attempts to justify restraints accompanying partial integrations does no violence to the concept of per se rules. Essentially, per se rules were developed in the interest of litigation efficiency
 "Per se rules always contain a degree of arbitrariness. They are justified on the assumption that the gains from imposition of the rule will far outweigh the losses and that significant administrative advantages will result. In other words, the potential competitive harm plus the administrative costs of determining in what particular situations the practice may be harmful must far outweigh the benefits that may result. If the potential benefits in the aggregate are outweighed to this degree, then they are simply not worth identifying in individual cases."
 United States v. Container Corp. of America, 393 U.S. 333, 341, 89 S.Ct. 510, 514-15, 21 L.Ed.2d 526 (1969) (Marshall, J., dissenting). See also Northern Pacific Railway Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958); Arizona v. Maricopa County Medical Society, --- U.S. ----, ----, ---- & n. 14, 102 S.Ct. 2466, 2473 & n. 14, 73 L.Ed.2d 48 (1982). In the context of restraints ancillary to integration, however, it cannot be said that in the aggregate "the gains from imposition of the rule will far outweigh the losses." The integration of productive activities may permit efficiencies of scale regarding research, advertising, and manufacturing; output may be enhanced; new entry into various markets may be facilitated. See Brodley, Joint Ventures and Antitrust Policy, 95 Harv.L.Rev. 1523, 1527-29 (1982); R. Bork, The Antitrust Paradox 263-66 (1978); L. Sullivan, Handbook of the Law of Antitrust Sec. 77, at 207 (1977). Cases applying the per se rule to naked price restraints confirm that in some circumstances price restraints ancillary to an integration of functions will escape the per se rule. "If a clinic offered complete medical coverage for a flat fee, the cooperating doctors would have the type of partnership arrangement in which a price fixing agreement among the doctors would be perfectly proper." Maricopa County, --- U.S. at ----, 102 S.Ct. at 2480.
 
 
 [7]
 Another twist on this argument is that promoting spectator consumption ensures that gate receipts will be large enough to enable institutions to fund football and other athletic programs. It is argued that in this manner the plan ensures an adequate number of teams to permit intercollegiate competition. To a certain extent, this argument is not unlike the contention that something other than competition is needed in the industry. Such an argument is not permitted under the Sherman Act. National Society of Professional Engineers v. United States, 435 U.S. 679, 689, 696, 98 S.Ct. 1355, 1364, 1367-68, 55 L.Ed.2d 637 (1978). If a market structure other than competition is necessary to engage in a line of commerce, Congress must be petitioned for an exemption from the antitrust laws
 
 
 [8]
 The district court ultimately rejected the argument that the plan enhances live viewership. 546 F.Supp. at 1295-96
 
 
 [9]
 The trial court's findings suggest that it placed the burden of proving the effectiveness and necessity of these restraints upon the NCAA. We believe that is the proper placement of the burden when considering whether to apply per se or rule of reason analysis to admitted price restraints that the defendant attempts to justify as properly ancillary to a legitimate integration
 
 
 [10]
 The price-distorting restraints, articles 10 and 13 of the television plan, relate to fostering athletic balance and enhancing live viewership--arguments rejected above
 
 
 [11]
 The establishment of a minimum aggregate compensation is a necessary incident to the conferral of exclusive rights: it prevents the networks from abusing their position vis-a-vis the individual schools. Therefore, in cases in which the granting of an exclusive right is appropriate, the setting of a price for that exclusive right may also be appropriate
 
 
 [12]
 The evidence consists largely of the testimony of Paul Klein. Klein testified that football would constitute viable network programming only if the network and advertising sponsors were granted exclusivity. That is, the networks would be unable to attract advertising sponsors if football programming competed head-to-head with other football programming. According to Klein, the plan's effect of permitting schools to sell only to ABC, CBS, and Turner is essential to the joint marketing arrangement
 
 
 [13]
 This argument assumes that NCAA football may be viewed as a single brand, a product of the joint venture rather than of the individual schools, and that football is in the same product market as other television programming. Upon the facial examination appropriate in the per se context these assumptions appear unlikely to be true
 
 
 [14]
 This conclusion, of course, obviates the necessity of examining whether the plan's restraints enhance the effectiveness of the marketing integration or are no broader than necessary for that purpose. When an integration is itself impermissible, the restraints justified as accompanying it are likewise impermissible
 
 
 [15]
 To the extent that the procompetitive justifications offered by the NCAA do not relate to an integration, but are offered to show the generally procompetitive nature of the television plan, they are foreclosed by Maricopa County
 "The respondents' principal argument is that the per se rule is inapplicable because their agreements are alleged to have procompetitive justifications. The argument indicates a misunderstanding of the per se concept. The anticompetitive potential inherent in all price fixing agreements justifies their facial invalidation even if procompetitive justifications are offered for some. Those claims of enhanced competition are so unlikely to prove significant in any particular case that we adhere to the rule of law that is justified in its general application."
 --- U.S. at ----, 102 S.Ct. at 2477 (footnote omitted).
 
 
 [16]
 The NCAA makes no separate argument urging reversal of the trial court's monopolization holding under section 2 of the Sherman Act. It notes the court's conclusion that the relevant market was the sale of rights to televise live college football games, in which the NCAA "obviously has the dominant share." Appellant's Brief at 10. The NCAA refers to its market definition argument, contending only that it does not possess market power and not that such power if possessed was lawfully obtained. Because of this and our disposition of the section 1 issues, we do not consider the monopolization claim. A reversal of the court's section 2 ruling would not affect the scope of relief granted
 
 
 [17]
 Because the rights were sold as a package only, broadcasters who lacked the financial resources necessary to purchase the package were foreclosed from bidding. We need not decide whether this constitutes an unlawful restraint under other antitrust theories; it does not implicate the per se rule against boycotts
 
 
 [18]
 The athletic director of the University of Southern California has stated that paragraph four has this effect. See Sports Illustrated, Sept. 27, 1982, at 9, 12